337 F.2d 552
 UNITED STATES of America, Appellee,
v.
Alfredo AVILES, Charles Barcellona, Charles Di Palermo,
Joseph Di Palermo, Natale Evola, Vito Genovese, Vincent
Gigante, Daniel Lessa, Nicholas Lessa, Rocco Mazzie, Carmine
Polizzano, Ralph Polizzano, and Salvatore Santora,
Defendants-Appellants.
 No. 370, Docket 27377.
 United States Court of Appeals Second Circuit.
 Argued April 16, 1964.
Decided Oct. 16, 1964.
 
 Robert M. Morgenthau, U.S. Atty., Southern District of New York (Robert J. Geniesse, Michael W. Mitchell, Paul R. Grand, John S. Martin, Jr., David M. Dorsen, Asst. U.S. Attys., of counsel), for appellee.
 Maurice Edelbaum, New York City, for appellant Evola.
 Albert J. Krieger, New York City, for appellants Charles Di Palermo and Joseph Di Palermo.
 Edward Bennett Williams, Robert L. Weinberg, Washington, D.C., Wilfred L. Davis, New York City, for appellant Genovese.
 Wilfred L. Davis, New York City, for appellant Gigante.
 Henry K. Chapman, New York City, for appellants Rocco Mazzie and Nicholas Lessa.
 Allen S. Stim, New York City, for appellant Ralph Polizzano.
 Roy L. Reardon, New York City, for appellant Barcellona.
 Herbert S. Siegal, New York City, for appellant Santora.
 Before WATERMAN, MOORE and MARSHALL, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 When this appeal was first before us, we affirmed the orders of Judge Bicks and Judge Murphy denying defendants' motions for a new trial. Our opinion is reported at 315 F.2d 186 (1963). Subsequently the Supreme Court granted certiorari, vacated our judgment, and remanded the case to us for reconsideration. Evola v. United States, 375 U.S. 32, 84 S.Ct. 24, 11 L.Ed.2d 106 (1963). In view of the importance of the case we authorized the parties to file additional briefs and to present further oral argument. Having studied with great care the unusually helpful material furnished to us by both sides, we adhere to our original decision.
 
 
 2
 For the sake of convenience, we repeat in part the facts of this case as set forth in our former opinion:
 
 
 3
 'After a three months' jury trial in the Southern District of New York, appellants were convicted, on April 17, 1959, of conspiracy to violate federal narcotic laws, 21 U.S.C. 173, 174. Their convictions were affirmed on appeal to this court, 274 F.2d 179, and the Supreme Court denied certiorari, Evola v. United States, 362 U.S. 974, 982, 80 S.Ct. 1057, 1058, 1059, 1068, 1071, 1073, 4 L.Ed.2d 1009, 1010, 1015, 1016, rehearing denied, Genovese v. United States, 363 U.S. 858, 80 S.Ct. 1610, 4 L.Ed.2d 1739.
 
 
 4
 'On August 26, 1960, appellants moved in the district court for a new trial, Rule 33, Fed.R.Crim.P., and put forth, as grounds for their motions: (1) alleged recantations of trial testimony by the principal government witness, Nelson Cantellops; (2) statements by Cantellops at the hearing on the motions for a new trial which were allegedly inconsistent with his original testimony; (3) allegedly new extrinsic evidence tending to establish Cantellops' perjury in his trial testimony concerning a certain trip to Las Vegas, Nevada; (4) alleged concealment at the trial of a rent record in the possession of the Government; (5) alleged post trial statements by Cantellops which tended to discredit his trial testimony; (6) alleged spoliation of notes of federal Narcotics Agents Rowan, Consoli, and Muglia, in violation of the Jencks Act, 18 U.S.C. 3500; and (7) failure of the Government to make available to the trial court certain interview notes of Assistant United States Attorney Donald H. Shaw, which notes were allegedly producible under the Jencks Act, 18 U.S.C. 3500.
 
 
 5
 'After extended hearings, Judge Bicks, who had presided at the original trial, denied appellants' motions insofar as they rested upon grounds 1 through 6 set forth above. 197 F.Supp. 536. He reserved decision with respect to the Shaw interview notes, indicating his intention to take further testimony regarding this issue. Due to the illness of Judge Bicks, however, the contemplated voir dire examination was not held. Judge Murphy was subsequently assigned to conduct the hearing and make a determination as to the ground upon which Judge Bicks had reserved decision. On December 22, 1961, Judge Murphy denied the motions for a new trial. 200 F.Supp. 711.
 
 
 6
 'From these orders below adverse to them appellants now prosecute this consolidated appeal claiming that the grounds set forth above are individually and collectively sufficient to entitle them to a new trial under Rule 33, Fed.R.Crim.P. As to the grounds 1 through 6 set forth above, we affirm the order below on the careful opinion of Judge Bicks. As to the Shaw interview notes, we affirm the order of denial below for the reasons set forth hereafter.
 
 
 7
 'In ruling on appellants' motions, Judge Murphy separated the Shaw materials into three groups:
 
 
 8
 '(1) Materials which were not 'substantially verbatim recitals' of Cantellops' statements. Into this group were placed Shaw's 'chronology of facts,' together with certain of Shaw's 'original notes and assorted miscellany.' Ruling that these materials would not have been found producible under 18 U.S.C. 3500 had they been made available for the court's inspection during the original trial, Judge Murphy concluded that their nonproduction was not prejudicial to appellants' interests. See Rosenberg v. United States, 360 U.S. 367, 370, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). We cannot say that Judge Murphy's findings with respect to these materials were erroneous.
 
 
 9
 '(2) Materials which were 'probably Jencks' statements.' Judge Murphy ruled that the nonproduction of this second group of materials, into which was placed 'the great majority' of Shaw's original interview notes, was nonprejudicial to appellants on the ground that 'virtually the(ir) entire contents' 'correspond(ed) with the grand jury testimony of Cantellops which was turned over to the defense.'
 
 
 10
 '(3) Notes which 'most assuredly should have been produced pursuant to 3500.' This group consisted of handwritten interview notes dated October 10 and 11, 1957. Although these notes contained new impeaching information not otherwise available to appellants, Judge Murphy ruled that nonproduction of these notes did not prejudice defendants' interests, in that defendants' cross-examination of Cantellops was not 'unduly restricted' thereby: * * *.' 315 F.2d 186, 188-189.
 
 
 11
 Judge Murphy ordered that the third group of notes be turned over to the defendants for purposes of the appeal, and later, in response to an order of this court, he ordered that the second group be turned over as well. On the appeal, however, we ruled that defendants had not been entitled to either group of notes at the original trial. We based our decision on the ground that the notes were not producible 'statements' within the Jencks Act definition of that term, 18 U.S.C. 3500(e).[1] We therefore found it unnecessary to decide whether defendants had been prejudiced by the government's failure to produce the notes at the original trial. A request by the defendants for a rehearing, alleging various errors in our decision, was denied in an order dated April 10, 1963.
 
 
 12
 In opposing defendants' petitions for certiorari, however, the government stated to the Supreme Court, 'Under the ruling of this Court in Campbell v. United States, (373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501) No. 631, O.T.1962, decided May 27, 1963, we accept Judge Murphy's findings that the Shaw notes should have been produced under 18 U.S.C. 3500.' The government chose to rely entirely on the argument that defendants were not prejudiced by its failure to produce the notes. Thereafter, the Supreme Court remanded the cases to us requesting 'reconsideration in light of Campbell v. United States, 373 U.S. 487 (83 S.Ct. 1356, 10 L.Ed.2d 501)' and 'such further consideration as may be appropriate,' 375 U.S. 32, 33, 84 S.Ct. 24.
 
 
 13
 Defendants argue that we should hold the government bound by the concession it made before the Supreme Court that the Shaw notes should have been produced under 18 U.S.C. 3500(e). To do so, however, would be to ignore the Supreme Court's remand order, which requests us to reconsider our decision in the light of Campbell v. United States, and not in the light of the government's concession. The defendants also contend that, in any event, we should accord great weight to this concession by the Department of Justice, but upon remand the government has repudiated its last year's concession. We do wish to point out, however, in view of the fact that the Supreme Court heard no oral argument when it granted certiorari and forthwith remanded the cases to us, that if the government had not made its short-lived concession in the first place, the Supreme Court might have finally disposed of the appeals with a consequent saving of time and energy all around. See dissenting opinion of Justice Clark, 375 U.S. 32, 33, 84 S.Ct. 24.
 
 
 14
 Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356 (1963) (hereinafter Campbell II) involved the question of whether either notes taken by a government agent at an interview with a government witness, or the interview report compiled by the government agent from his notes which were subsequently destroyed, were producible statements within the meaning of the Jencks Act, 18 U.S.C. 3500(e). The Supreme Court held that the findings of the district judge on this question were not to be disturbed unless clearly erroneous; and that the district judge was not clearly erroneous in finding the notes to be producible under 18 U.S.C. 3500(e)(1) and the report to be a producible copy of the notes. In view of this result, the Supreme Court found it unnecessary to decide whether the destruction of the notes called for sanctions under 18 U.S.C. 3500(d).
 
 
 15
 These are the rulings in the light of which we are asked to reconsider our former decision. As for the portion of the remand order requesting 'such further consideration as may be appropriate,' we construe it to mean that if in the light of Campbell II we hold that the Shaw notes and certain other materials were producible under the Jencks Act, we should go on to consider whether the government's failure to produce these materials at the original trial was harmful error, a question we found it unnecessary to discuss in our former opinion. There is nothing in the remand order to suggest that we should take the extraordinary step of deciding the entire appeal all over again.
 
 
 16
 * Defendants claim that Campbell II requires us to affirm Judge Murphy's finding that most of the Shaw notes were producible under 18 U.S.C. 3500(e)(2), unless his finding was clearly erroneous. In our former opinion we adopted a much broader standard of review:
 
 
 17
 'In ruling that the October 10 and 11 notes were Jencks 'statements,' and that the great majority of Shaw's other original interview notes were probably 'verbatim recitals' within the Act's definition, Judge Murphy relied solely upon the notes themselves and upon the record of Shaw's earlier testimony before Judge Bicks. Judge Murphy conducted no voir dire examination of Shaw and received no testimony from any other witness prior to ruling upon this portion of appellants' motions. As we have available to us all of the materials upon which Judge Murphy based his rulings, our conclusion with respect to this factual issue is entitled to no less weight than that of the Court below.' 315 F.2d 186, 191.
 
 
 18
 Defendants are correct in arguing that Campbell II bears on the question of how freely we may review Judge Murphy's findings. Although that case concerned producibility under 18 U.S.C. 3500(e)(1), its holding that the findings of the district court were not to be disturbed unless clearly erroneous applies to 3500(e)(2) as well. The Supreme Court based the holding largely on Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), which was an (e)(2) case. Furthermore, as the government acknowledges, the issues under (e) (1) and (e)(2) are often similar. Thus, in Palermo the Supreme Court decided whether an interview memorandum 'could fairly be deemed to reflect fully and without distortion what had been said to the government agent,' 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, while in Campbell II the Court decided whether an interview report 'may fairly be deemed a copy' of interview notes approved by the witness, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360.
 
 
 19
 As far as it went, however, our ruling concerning the scope of review was compatible with Campbell II. The result in that case turned largely on the credibility of live testimony given before the same district judge whose findings were being scrutinized by the appellate courts. Accordingly, the Supreme Court based its holding in part on the ground that the findings of the district judge 'may well have depended upon nuances of testimony and demeanor of witnesses,' ibid. As all the evidence before Judge Murphy was in writing and as no witness was orally examined in his presence, this reasoning is not applicable to our case. See Evola v. United States, 375 U.S. 32, 33, 84 S.Ct. 24 (dissenting opinion).
 
 
 20
 The Supreme Court based its holding in Campbell II on two other grounds as well: The findings of the district judge as to producibility 'required the ad hoc appraisal of one of the 'myriad' 'possible permutations of fact and circumstance', Palermo v. United States, supra, 360 U.S., at 353 (79 S.Ct., at 1225, 3 L.Ed.2d 1287), present in such cases,' and they 'concerned a subject, rulings on evidence, which is peculiarly the province of trial courts,' 373 U.S. 487, 493, 83 S.Ct. 1356, 1361. This decisional rationale goes beyond that of our former ruling and consequently requires us to consider the problem further.
 
 
 21
 To support its reasoning, the Supreme Court in Campbell II quoted Palermo:
 
 
 22
 "Final decision as to production must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge guided by the standards we have outlined, and subject to the appropriately limited review of appellate courts.' Palermo v. United States, 360 U.S. 343, 353 (79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287).' Ibid.
 
 
 23
 This passage suggests to us that if the district court mistakes the standards outlined by the Supreme Court for applying 18 U.S.C. 3500(e)(2), and is not guided thereby, its findings are no longer entitled to their usual respect. Such a view is in accord with the settled doctrine that 'findings of fact that are induced by an erroneous view of the law are not binding.' 5 Moore, Federal Practice, P52.03(2), at 2631 (2d ed. 1951); accord, United States v. Singer Mfg. Co., 374 U.S. 174, 193, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
 
 
 24
 Moreover, in all the cases cited, the Supreme Court not only stated the correct legal standard but went on to make its own findings of fact. It did not remand the cases to the district court for any reconsideration below. Our court has followed this procedure where the error concerned the law of evidence, where the facts were in dispute, and where the findings of the district court were based wholly on written material. United States v. Consolidated Laundries Corp., 291 F.2d 563, 569 (2 Cir. 1961); cf. Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc., 221 F.2d 464, 467 n. 7 (2 Cir. 1955), cert. denied, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955).
 
 
 25
 In determining whether the Shaw notes were a 'substantially verbatim recital' of what Cantellops told Shaw, Judge Murphy applied the same legal test that was employed by the trial court at the original trial of the defendants. 200 F.Supp. 711, 714-715. We, on the other hand, applied the test in Palermo which was laid down by the Supreme Court subsequent to the original trial, 315 F.2d 186, 191-192. Defendants argue, as they did in their petitions for a rehearing of our former decision, that Judge Murphy was right and we were wrong, but we rejected this argument in denying the petitions for rehearing; and nothing said in Campbell II requires us to reconsider our choice.
 
 
 26
 There is a marked difference between the test employed by Judge Murphy and the test prescribed by Palermo. Judge Murphy asked whether the Shaw notes 'set forth in substance what the witness said,' 200 F.Supp. 711, 715. Palermo makes it clear that this is not enough to satisfy the requirements of 18 U.S.C. 3500(e)(2): 'Summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced,' 360 U.S. 343, 352-353, 79 S.Ct. 1217, 1225. On the contrary, 'only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment,' 360 U.S. 343, 352, 79 S.Ct. 1217, 1224.
 
 
 27
 As Judge Murphy's findings of fact were induced by a mistaken view of the law, the limited review of a district judge's findings prescribed by Campbell II does not apply, and, in consequence, we were free to determine the facts for ourselves.
 
 II
 
 28
 Defendants claim that Campbell II requires us, ourselves, to find that most of the Shaw notes were producible under 18 U.S.C. 3500(e)(2). In our former opinion we decided to the contrary:
 
 
 29
 'Shaw testified at the post-trial hearing before Judge Bicks that he met with Cantellops 20 or 30 times over the course of almost a year. He testified that Cantellops spoke rapidly and in poor English, requiring that he 'almost translate it and put it into a more recognizable form of English'. He stated that the notes were never read back to Cantellops, that Cantellops never signed or initialed them, and that only about one half of the notes contained information elicited from Cantellops, the remainder containing information coming from 'close to a dozen different sources.' Finally, Shaw testified that it was his practice to go over the notes after the interview and make additions to them, as the notes were taken not for the purpose of providing a record of Cantellops' testimony, but to assist Shaw in drafting the chronological statement and to serve as a guide in interrogating Cantellops before the grand jury.
 
 
 30
 'Shaw's affidavit, submitted to Judge Murphy in support of the Government's motion for reargument, substantiates the foregoing, and adds that Shaw was selective in his note-taking and did not record the testimony that he thought was 'incoherent, illogical or in conflict with what the assistant then knew to be the fact from other witnesses.'
 
 
 31
 'Finally, the documents themselves indicate that they are the result of a process of selection. They are not as voluminous as they would be if they were complete transcriptions of Shaw's 20 to 30 interviews with Cantellops. Further, the signs of addition and interpolation are evident on the face of the documents.
 
 
 32
 'We hold, consequently, that the Shaw materials contained no statements which, had they been delivered to the trial court for in camera inspection, would have been found to be producible under the Jencks Act.' 315 F.2d 186, 192.
 
 
 33
 Defendants are correct in arguing that Campbell II bears on the question of whether, under 18 U.S.C. 3500(e)(2), the Shaw notes were a 'substantially verbatim recital' of what Cantellops told Shaw. Although Campbell II was concerned with the question of whether an interview report was a 'copy' of a written statement made and adopted by a government witness under (e)(1), the issues are similar. The Supreme Court made this clear by employing in Campbell II the test laid down in Palermo, an (e)(2) case: 'Whether it would be 'grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own.' Palermo v. United States, supra, 360 U.S., at 350 (79 S.Ct. at 1223, 3 L.Ed.2d 1287),' 373 U.S. 487, 495, 83 S.Ct. 1356, 1362.
 
 
 34
 In Campbell II, the Supreme Court held that the interview report was a copy of the written statement, there being no 'material differences between the statement and the report. * * * The only variances, apparently, are grammatical and syntactical changes, rearrangement into chronological order, and omissions and additions of information immaterial for impeachment purposes,' 373 U.S. 487, 495, n. 10, 83 S.Ct. 1356, 1361. Moreover, 'the district judge was entitled to infer that an agent of the Federal Bureau of Investigation of some 15 years' experience would record a potential witness' statement with sufficient accuracy' to qualify the interview report as a copy of the written statement, 373 U.S. 487, 495, 83 S.Ct. 1356, 1361.
 
 
 35
 Our former decision is nowise inconsistent with these rulings. The variances between the Shaw notes and the oral statements of the government witness went beyond matters of grammar, syntax, and chronology. There were certain omissions in the notes attributable to the fact that Cantellops spoke rapidly and in poor English. There were other omissions when Cantellops' story was thought by Shaw to be incoherent, illogical, or in conflict with what he then believed to be the facts. There were also additions of related matter from other sources. These omissions and additions of information were not immaterial for impeachment purposes. It would have been grossly unfair to allow the defense on cross-examination to confront Cantellops with the Shaw notes as if they were his own statements. Although courts should show the greatest liberality in making available to the defense any writing which represents what the witness may have said, they must also be meticulous in satisfying themselves that what is made available truly represents the witness' own statements. On the specific facts here presented the latter requirement has not been met.
 
 
 36
 Moreover, the inference that government agents are accurate recorders of witnesses' statements is inapplicable in this case. It was not Shaw's aim to provide a record of Cantellops' story, but to draft for his own use a chronological statement which would serve, as well, as a guide in interrogating Cantellops before a grand jury. As for the defendants' argument, first asserted in their petitions for rehearing of our former decision, that the Shaw affidavit is not properly part of the factual record before us, we rejected that argument when we denied the petitions for rehearing; and nothing said in Campbell II requires us to reconsider that conclusion.
 
 
 37
 Inasmuch as the Shaw notes were not properly producible under 18 U.S.C. 3500(e)(2), a new trial on account of the government's failure to produce them was rightly refused.
 
 III
 
 38
 Defendants claim that Campbell II requires us to find that the Consoli notes were producible under 18 U.S.C. 3500(e)(1), and that the decision invites us to rule that the destruction of the notes by the government calls for sanctions under 18 U.S.C. 3500(d). In our former opinion we approved verbatim Judge Bicks's disposition of this point:
 
 
 39
 'Agent Consoli, a member of the Enforcement and Special Squads, took notes during interviews with the witness Cantellops. These interviews were to be the subject of memorandum reports which Consoli planned to and did write. His unimpeached testimony is to the effect that the contents of the notes were incorporated in a memorandum report and thereafter the notes were destroyed. These notes, however, were not verbatim but were handwritten accounts of selected portions of the interviews and hence, not 'statements' within the Jencks statute. There is no suggestion or any basis for a suggestion that Consoli's handwritten notes which were used in the preparation of his reports were destroyed in bad faith or with the intention to circumvent the Jencks case or statute. In any case, the relevant portions of Consoli's memorandum reports were made available to movants at the trial in the exercise of the Court's discretion.' 197 F.Supp. 536, 557-558.
 
 
 40
 It is apparent that Judge Bicks was concerned only with the producibility of the Consoli notes under 18 U.S.C. 3500(e)(2) and not under (e)(1). This was entirely proper in view of the state of the law at that time. Campbell II has now given a broad reading to (e)(1), however, and we assume for the sake of argument that it encompasses certain portions of the Consoli notes. But Campbell II also held that destruction (at least in good faith) of interview notes producible under 18 U.S.C. 3500(e)(1) does not call for sanctions under 18 U.S.C. 3500(d) if the defense is furnished with a copy of the notes, 373 U.S. 487, 491 n. 5, 83 S.Ct. 1356.
 
 
 41
 Our former disposition of this part of the appeal is confirmed by the holding of Campbell II. Judge Bicks ruled, on the basis of live testimony, that the Consoli notes were destroyed in good faith, and there is nothing in the record making this finding clearly erroneous. Judge Bicks did not rule, however, on the question of whether the memorandum reports were a copy of the interview notes, and, were he still an active judge, we might, because he heard live testimony on the point, return the case to him for a finding on this issue. Regrettably, Judge Bicks has since died, and, in order to expedite this appeal, we shall ourselves decide the question.
 
 
 42
 Consoli testified at the post-trial hearing before Judge Bicks that he made a memorandum report for each set of his interview notes; that he incorporated the interview notes into his memorandum reports without changes, additions, or omissions; that he then expanded the memorandum reports with material of other kinds; that he read back to Cantellops for his approval those portions of the memorandum reports derived from the interview notes; and that his superiors reviewed the memorandum reports for accuracy and clarity but made no changes in them. Nothing in the memorandum reports or in the record throws doubt on this testimony. Accordingly, we find that those portions of Consoli's memorandum reports that purport to have been statements made by Cantellops are copies of Consoli's interview notes.
 
 
 43
 At the original trial, Judge Bicks turned over to the defense those portions of the memorandum reports that he found producible under 18 U.S.C. 3500(e)(2). This might not have been enough if there had been other portions of the memorandum reports that contained matter producible under (e)(1). Therefore, we have examined all the memorandum reports written by Consoli which were delivered to Judge Bicks, and we find that everything in them which could possibly have been statements made by Cantellops was turned over to the defense. As the defendants received a copy of all the Consoli interview notes, their good faith destruction by the government did not call for sanctions under 18 U.S.C. 3500(d).
 
 
 44
 The orders of Judge Bicks and Judge Murphy denying defendants' motions for a new trial are again affirmed.
 
 
 45
 MARSHALL, Circuit Judge (dissenting).
 
 
 46
 The real controversy before us involves Shaw's notes entitled 'Re: Conversation with Nelson Cantellops on October 10, 1957' and '10/11/57.' It is upon the failure of the Government to produce these notes that defendants' motion for a new trial must rest.
 
 
 47
 Judge Murphy held that these 'notes most assuredly should have been produced pursuant to 3500.' 200 F.Supp. 711, 715-716. Yet he denied the motion for a new trial on the ground that the failure to produce them was not prejudicial. Judge Murphy concluded that even though these notes were 'statements' and hence producible under the Jencks Act, and even though they contained new impeaching information not otherwise available to defendants, 'in the context of this long trial and in view of the fact that the witness's credibility had been so exhaustively explored we hold that the failure to produce Shaw's (October 10-11, 1957) notes was not prejudicial to defendants.' 200 F.Supp. at 717. An appeal was taken from Judge Murphy's order denying the motion for a new trial and in our opinion of March 8, 1963 we affirmed. We never reached the question of whether the nonproduction was prejudicial. Instead, we took the position that these notes were not statements and hence not producible within the meaning of the Jencks Act. 315 F.2d 186, 191-192. We prefaced our inquiry into the question whether these notes were producible with the announcement that we were going to give very little weight, if any, to the findings of the District Judge: 'As we have available to us all of the materials upon which Judge Murphy based his rulings, our conclusion with respect to this factual issue is entitled to no less weight than that of the Court below.' Id. at 191.
 
 
 48
 On May 27, 1963, little more than two months after we handed down our opinion in the appeal from Judge Murphy's order, the Supreme Court decided Campbell v. United States (Campbell II), 373 U.S. 487, 83 S.Ct. 1356, which held that a district judge's findings of fact supporting a ruling that a writing is a 'statement' within the meaning of the Jencks Act and hence producible should not be disturbed by a circuit court of appeals unless these findings are 'clearly erroneous.' On October 21, 1963, the petitions for writs of certiorari in these cases were granted by the Supreme Court, our judgment 'vacated,' and the cases remanded to this Court 'for consideration in light of' Campbell II and 'for such further consideration as may be appropriate.' Evola v. United States, 375 U.S. 32, 33, 84 S.Ct. 24, 11 L.Ed.2d 106. Although this Supreme Court mandate is not free of ambiguity, I feel that my Brothers have misinterpreted its import. I, therefore, must respectfully dissent.
 
 
 49
 The most natural interpretation of the Supreme Court's mandate is that we were in error in making the de novo inquiry into the question of whether the notes were producible and that the clearly-erroneous standard of Campbell II would apply even if the district judge's factual findings were made under 3500(e)(2) rather than 3500(e)(1)[1] and the evidence before the district judge was written and documentary rather than live testimony.[2] Our judgment was vacated because it was premised on a conception of the role of a reviewing court which Campbell II implied, if not actually held, was mistaken. Yet the Supreme Court's remand mandate left enough room for us to decide whether the findings of Judge Murphy were 'clearly erroneous,' and, if we decided that question in the negative, to decide whether Judge Murphy erred in holding that the unlawful nonproduction was non-prejudicial and not sufficient to warrant a new trial.[3]
 
 
 50
 There are, of course, other reasonable interpretations of the remand mandate; for example, since our decision predated Campbell II by two months, the Supreme Court may have wanted to give us an opportunity to decide whether the 'clearly erroneous' standard applied when the evidence before the trial judge was entirely written and documentary and then to take other appropriate action. Or it is even conceivable that the Court wanted us to follow the procedure used by the First Circuit after the remand in Campbell I, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961)-- retain jurisdiction on the appeal, and return the papers to Judge Murphy with instructions to take the necessary testimony and evidence to determine whether the notes were 'statements' within the meaning of the statute. 296 F.2d 527, 534 (1 Cir. 1961).
 
 
 51
 The majority here is not content with choosing among these interpretations of the Supreme Court's mandate, but instead takes quite a different tack: 'As Judge Murphy's findings of fact were induced by a mistaken view of the law, the limited review of a district judge's findings prescribed by Campbell II does not apply, and, in consequence, we were free to determine the facts for ourselves.' I take issue with this disposition, not simply because it is wholly foreign to what was envisioned in the Supreme Court's remand mandate, but for more basic reasons.
 
 
 52
 The premise underlying the majority's position is that Judge Murphy used the wrong standard of law in determining whether the notes are 'statements.' I cannot agree. True, Judge Murphy asked whether the Shaw notes 'set forth in substance what the witness said,' but there is not the slightest intimation that this formula was anything less than a paraphrase of the 'substantially verbatim recital' phrase of the statute. In fact, Judge Murphy often reverts to the statutory language in his discussion of these particular notes.[4] There is no indication that under his view of the law he would have accepted, as the 'statements' required by the Jencks Act, mere 'summaries' 'which evidence substantial selection of material or which were prepared after the interview without the aid of complete notes.' He focused on the contemporaneous aspect of Shaw's transcription and on the resemblance between what Shaw attempted to do and what a stenographer would attempt to do. It would be unfortunate to abstract the formula Judge Murphy employed from his actual use of it and to build a case on the presence of the words 'in substance.'
 
 
 53
 Furthermore, even if I were willing to concede, and I am not, that Judge Murphy used the wrong standard of law, it does not at all follow that we, as circuit judges, are 'free to determine the facts for ourselves.' Campbell II's clearly-erroneous standard would of course not apply if the district judge used the wrong standard of law, but the basic value judgment underlying Campbell II, namely, that district or trial judges and not circuit judges are the ones best suited to make the findings of fact required in applying the Jencks Act (see 373 U.S. at 493, 83 S.Ct. 1356), suggests to me that the proper course for us to take would be to vacate the judgment of the district court, state the correct standard of law that should be used by the district court and remand to the district court to make the appropriate findings of fact. Cf. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). It seems that this course would be the one to be followed under the majority's premise that Judge Murphy used the wrong standard even if most of the evidence thus far is written and documentary, especially in light of the fact that on the remand to the district court Shaw could be called on to testify. Testimonial evidence may always become relevant and available when the new and proper standard is being applied and I fear that if we decided the facts for ourselves de novo we would be depriving the parties of the rich and special experience which a trial judge could always bring to any fact-finding process.
 
 
 
 [1]
 The statute provides in part as follows:
 '(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
 '(d) If the United States elects not to comply with an order of the court under paragraph (b) * * * to deliver to the defendant any such statement, * * * the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.
 '(e) The term 'statement', as used in subsections (b) * * * and (d) of this section in relation to any witness called by the United States, means--
 '(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or
 '(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.'
 
 
 [1]
 My Brothers acknowledge this, see supra p. 556
 
 
 [2]
 As my Brothers recognize, supra pp. 556, 557 the Supreme Court in Campbell II based the clearly-erroneous standard on something more than the trial judge's unique position to evaluate the 'demeanor of witnesses.' See 373 U.S. at 493, 83 S.Ct. at 1360. Of course, as was true in Campbell II, the clearly-erroneous standard applies even if the district judge is not the same one who conducted the original trial. S.Ct. 1356
 
 
 [3]
 This interpretation appears all the more reasonable because the Solicitor General, in opposing defendants' petition for certiorari, conceded that, under Campbell II, Judge Murphy's findings that these notes are producible should not be disturbed. Brief in Opposition, p. 36
 
 
 [4]
 'And since that statute requires production of statements if only 'substantially verbatim' and recorded but 'contemporaneously,' then so long as such a statement is relevant to the direct testimony of the witness it would be producible under the statute notwithstanding that it were written or recorded by a government attorney, at least if taken during the investigative stage of the case as here, as distinguished from notes made in preparation for trial
 'These October, 1957, notes were therefore producible if they contained 'in substance what the witness said,' there being no question here but that they were in fact contemporaneously written by Shaw. From the beginning to the end of these particular notes they are written in the first person and they contain numerous quotes for responses or questions of third persons with whom Cantellops apparently narrates he was conversing. This, together with the very 'flavor' of the notes, and bearing in mind Shaw's testimony at the post-trial hearing, inter alia, as to the difficulty of taking a statement from Cantellops, constrains us to conclude (and no voir dire seems necessary for us to so find) that these notes would be found by the trial court to be, and are in fact, substantially verbatim statements, and of course, relevant to Cantellops' trial testimony on direct examination.' 200 F.Supp. at 715-716. See also Campbell II, 373 U.S. at 495 n. 10, 83 S.Ct. 1356.