UNITED STATES of America, Appellee,

v.

Richard E. FOLEY,
Defendant, Appellant.

No. 88–1399.

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1989.

Decided April 4, 1989.

As Amended April 7, 1989.

Owen S. Walker, Federal Defender Office, Boston, Mass., for defendant, appellant.

Kevin F. Driscoll, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief for U.S.

Before BOWNES, ALDRICH and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant, Richard E. Foley, was found guilty after a jury-waived trial on four counts of perjury before a grand jury in violation of 18 U.S.C. § 1623 and one count of obstruction of justice in violation of 18 U.S.C. § 1503. The obstruction of justice count charged that defendant threatened a witness to prevent him from giving information to the government and that defendant planned to and did testify falsely to the grand jury.

Defendant raises three issues before us: (1) that by excluding portions of tape recorded statements he made to a witness, the district court impaired its ability to assess properly the truth or falsity of defendant's answers to grand jury questions; (2) that the district court erred in ruling that FBI reports of interviews with the government's chief witness were not Jencks Act material; and (3) the district court improperly admitted irrelevant and prejudicial evidence.

## I. THE PRELUDE

Our review of the facts is made in the light most favorable to the government and drawing all reasonable inferences in its favor. *United States v. Ingraham*, 832 F.2d 229, 230 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Cintolo*, 818 F.2d 980, 983 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

Wade Federici, the chief government witness, was the manager of a restaurant-bar in Weymouth called The Great Escape. He first met the defendant in 1983. Defendant worked for a construction company and was an occasional customer of The Great Escape. Federici knew that defendant carried a handgun and used cocaine. In 1985 Defendant went to jail for assault with a dangerous weapon—a firearm. Based on the same set of facts, he was also convicted of unlawful discharge of a firearm and being a disorderly person.

In August of 1986, The Great Escape was inspected by employees of the Massachusetts Alcoholic Beverage Control Commission (ABCC). Several violations of the law were noted and the ABCC started proceedings to close The Great Escape for 28 days.

In November of 1986, defendant visited The Great Escape and left a message for Federici to the effect that by reason of his contacts he could get the ABCC case against The Great Escape fixed. Federici thought the ABCC was treating The Great Escape unfairly. He also was under the impression that the ABCC could be bought off. Federici therefore reported defendant's approach to Captain Rumble of the Weymouth police department. Rumble subsequently introduced Federici to special FBI agents James Irwin and James Burleigh. Federici agreed to wear a body recorder and tape record telephone and face-to-face conversations with defendant.

Numerous conversations between defendant and Federici were recorded: seven in December of 1986; four in January of 1987; three in February; four in March; and two in April. The conversations are larded with expletives and racial epithets. The substance of defendant's statements was far ranging. He boasted of his wealth and how tough he was and strongly intimated not only that he was capable of physical violence but that he had friends who were not adverse to strong-arm tactics. Defendant claimed that he was well acquainted with former Boston Mayor Kevin White, former Massachusetts Attorneys General McCormack and Bellotti and Massachusetts State Treasurer Robert Crane. He stated that he had been involved in deals "with White and McCormack" and knew of other deals involving them. Defendant stated that giving cash or gifts to public officials was how business was done and that he knew this because of personal observation and participation. He claimed that he had discussed real estate tax abatements privately with the former chairperson of the Boston Board of Assessors. Defendant also claimed that he had close ties to persons of national prominence, including Howard Hughes, Cardinal Cushing, Nelson Rockefeller and members of the Kennedy family. In one of the recorded conversations, defendant stated in effect that he had access to negotiable bonds which could be bought at a substantial discount. Defendant also made specific suggestions as to how the ABCC proceedings could be terminated by the payment of $4,000; the ABCC had required a cash bond of $40,000 to stay the closing of The Great Escape.

Defendant testified before the grand jury on January 21, 1987. The questions asked of defendant were, of course, based on his recorded statements.

Prior to trial, the district court granted the government's motion-in-limine to exclude portions of the tape recording and other evidence which the government claimed was not relevant. Defendant's motion-in-limine to exclude irrelevant and prejudicial evidence was denied. There were about 650 pages of taped conversations; the government introduced about 90 pages of them at trial.

## II. THE ISSUES

### A. *The Exclusion of Portions of Defendant's Tape Recorded Statements.*

■ Defendant does not deny that the answers he gave to the grand jury questions contradicted his recorded statements and were false. His defense is that the government did not prove as required under 18 U.S.C. § 1623 that the false answers were made knowingly.[1] Defendant argues that in order to prove that the answers were made knowingly, the government had to show that when he denied making the recorded statements, he remembered the discussions he had with Federici and deliberately lied about them. Defendant points out that many of the grand jury questions did not focus on specific statements made on certain dates. Rather, the majority of the questions were broad and impersonal such as: "Have you ever given cash for any reason to any public official? Do you have any knowledge, directly or indirectly, of anyone else giving cash gifts or anything of value to any public official?" There were also more specific questions based on defendant's recorded statements about claimed contacts with former Mayor White and former Attorney General McCormack.

The excluded tape recorded conversations showed that defendant claimed personal contacts with a number of other persons: Cardinal Cushing; the Kennedy family; Howard Hughes; Nelson Rockefeller; Governor Dukakis; Dwight Evans and Carl Yastrzemski (Boston Red Sox); and the Anguillo and Patriarca families (reputed to be prominent in the New England mafia). It is defendant's contention that if the district judge had listened to the excluded tape recordings, he might have had doubts as to whether the defendant was a person who would remember particular discussions he had with Federici about former Mayor White, Attorney General McCormack and other persons. Defendant argues that the exclusion of a great deal of the tape recorded evidence narrowed and distorted the district court's perspective of the case. The recorded statements put in evidence made defendant appear to be an active and corrupt wheeler and dealer who would lie to the grand jury to protect himself and his alleged friends. But if all of the recorded conversations had been included in evidence, a different picture would have emerged. Defendant would have been revealed not to be a real wheeler and dealer but a Walter Mitty living in a fantasy world who could not possibly remember the statements he had made about persons he claimed to know. Therefore, defendant asserts, the excluded statements were relevant and it was reversible error to grant the government's motion-in-limine.

Defendant's argument construct is ingenious but founders on the rocks of reality. It is important to point out that defendant never told the grand jury that he could not remember making the statements about which he was questioned. He denied making them. It was his credibility, not his memory, that was at issue. We also note that defendant has not raised any issue as to his mental state. There was testimony by a psychiatrist at the trial to the effect that although defendant had a problem forming memories while intoxicated,[2] he had no psychotic disorder, knew the difference between right and wrong and would not make up something totally false.

---

1. 18 U.S.C. § 1623(a) provides in pertinent part: "Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States *knowingly* makes any false material declaration...." (Emphasis added).

2. There was no evidence that defendant was intoxicated when he testified before the grand jury or during any of his taped conversations with Federici.

Fed.R.Evid. 401 defines relevant evidence as: "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 provides that relevant evidence is, subject to specific exceptions, generally admissible. Rule 403 is one of the specific exceptions to admissibility. It states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The test for reviewing exclusion of evidence under Fed.R. Evid. 403 is abuse of discretion. *United States v. King*, 827 F.2d 864, 867 (1st Cir. 1987); *United States v. Jarabek*, 726 F.2d 889, 903 (1st Cir.1984).

Although the district court did not specify the grounds for excluding a portion of the recorded conversations, it would not have been an abuse of discretion to exclude the evidence solely on the basis of the quoted language from Fed.R.Evid. 403. It had before it all that was necessary to decide the issue of relevancy and the applicability of Rule 403. Both counsel submitted memoranda of law and presented oral argument on the motion-in-limine. The court had the tapes of all the conversations between defendant and Federici and transcripts of five of the tapes.

We have transcripts of all the conversations between Federici and Foley; they were submitted by a joint motion dated October 24, 1988. Our review of the transcripts convinces us that the trial court had solid grounds for excluding part of the material on grounds of relevancy. As for the rest, a court's refusal to introduce collateral issues at trial has been characterized by Holmes as a "concession to the shortness of life." *Reeve v. Dennett*, 145 Mass. 23, 28, 11 N.E. 938 (1887).

B. *The Jencks Act Ruling.*

■ FBI agents interviewed Federici many times during the course of their investigation of defendant and prepared reports of the interviews. Such reports are commonly referred to as "302s." Prior to cross-examination of Federici, defense counsel requested the interview reports on the basis that he was entitled to them under the Jencks Act, 18 U.S.C. § 3500 which provides, in pertinent part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(b). The definition of "statement" on which defendant relies is found in 18 U.S.C. § 3500(e)(2): "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement."

Defendant claims that the 302s were "substantially verbatim recitals" of oral statements made by Federici and recorded contemporaneously by an FBI agent. This claim is based on the following testimony by Federici.

Q: Now, on the occasions when [FBI Agent Lavin] took notes did he ask you questions about what happened and write down your answer—write down what you told him?

A: Yes, sir.

Q: All right. And did he ever ask you questions as to whether he had got it right—what he was writing down— and ask you to elaborate on what you had said?

A: I would find Mr. Lavin a very punctilious note-taker. At times he would, when I was going too fast, he would ask me to slow up, and he would re-

peat back to me to make sure that he had, in fact, written down what I had said in the middle of a sentence—just to make sure he got it right. Then we'd go on and he would continue to make notes.

Q: So it was almost as if he was almost verbatim trying to get what you said as accurate[ly] as possible?

A: I would, again, consider Special Agent Lavin a very punctilious note-taker.

Defendant argues that this testimony establishes that the 302s fell within the quoted language of § 3500(e)(2).

In *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), the court focused on subsection (e)(2). It held: "We find the legislative history persuasive that the statute was meant to encompass more than automatic reproduction of oral statements." *Id.* at 352, 79 S.Ct. at 1224. It amplified this:

> It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent.

*Id.* (footnote omitted). The Court went on to stress that final decision rested "within the good sense and experience of the district judge, guided by the standards we have outlined...." *Id.* at 353, 79 S.Ct. at 1225. It also advised that in doubtful cases, "we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination." *Id.* at 354, 79 S.Ct. at 1225. This was done in the instant case. The Court then went on to state: "It is also the function of the trial judge to decide, in light of the circumstances of each case, what, if any, evidence extrinsic to the evidence itself may or must be offered to prove the nature of the statement." *Id.* at 354–55, 79 S.Ct. at 1226. Outside of the quoted testi-

mony, no extrinsic evidence was taken in the case before us.

In *Goldberg v. United States*, 425 U.S. 94, 108, 96 S.Ct. 1338, 1347, 47 L.Ed.2d 603 (1976), the Court reiterated the procedure to be followed: "We have recognized that a Government objection to production may require that the trial court inspect documents or hold a hearing to gather extrinsic evidence bearing on the extent to which the documents are statements producible under § 3500." (Footnote omitted). As we stated in *United States v. Strahl*, 590 F.2d 10, 14–15 (1st Cir.), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1237, 59 L.Ed.2d 468 (1979), if the district court had relied on assurances by the prosecution that the 302s were not statements under the Jencks Act and had failed to either review the 302s *in camera* or hold a hearing, we would be required to remand for additional fact finding. The district court here did, however, examine the material sought *in camera* and concluded that it did not fall within § 3500(e)(2) of the Jencks Act. Obviously, if an inspection of the documents suffices, there is no need to take extrinsic evidence. "In most cases the answer will be plain from the statement itself." *Palermo*, 360 U.S. at 355, 79 S.Ct. at 1226. We have reviewed the 302s and do not find that the district court's ruling was clearly erroneous. It is plain that the 302s are not substantially verbatim recitals of oral statements made by Federici and recorded contemporaneously with the making of the statements.

## C. *The Admission of Evidence.*

■ Defendant claims that the district court erred in admitting irrelevant evidence: evidence of prior and contemporaneous criminal activity [3] and racial epithets directed against Blacks and Jews. It is defendant's contention that this evidence improperly influenced the district judge and was a factor leading to his finding the defendant guilty. This argument strikes at the heart of one of the basic tenets of a bench trial: that despite the admission of

---

**3.** The criminal actions included cocaine addiction and the sale of cocaine, trafficking in stolen

bonds and the express intent to plant cocaine on one of his employers.

irrelevant evidence and what for a jury would be prejudicial evidence, it is presumed that a trial judge will consider only admissible evidence in making his/her findings.

We start our analysis by assuming that all of the evidence defendant sought excluded by his pretrial motion-in-limine was either irrelevant or, if this had been a jury trial, would have been excluded because its prejudice outweighed its probative value. It is to be noted first that all of the evidence came from the taped statements of defendant. There is no issue of third party credibility. Secondly, we have found nothing in the trial record suggesting that the district judge was prejudiced in any way against the defendant because of this evidence. Nor has defendant pointed to any remarks by the trial judge indicating bias or a predisposition to find the defendant guilty on the basis of his other criminal activity or racial epithets rather than the relevant evidence.

The law on this issue is clear, consistent and longstanding. The United States Supreme Court in *Sinclair v. United States,* 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938 (1929), in addressing a criminal defendant's charge that admission of certain evidence at a bench trial was error, stated:

> In answer, we need only refer to what was said in *The United States v. King,* 7 How. 833, 854, 855 [12 L.Ed. 934]: "In some unimportant particulars, the evidence objected to was not admissible. But where the court decides the fact and the law without the intervention of a jury, the admission of illegal testimony, even if material, is not of itself a ground for reversing the judgment, nor is it properly the subject of a bill of exceptions. If evidence appears to have been improperly admitted, the appellate court will reject it, and proceed to decide the cause as if it was not in the record."

*Id.* at 767, 49 S.Ct. at 477. In *Harris v. Rivera,* 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (per curiam), the Court recognized that the presumption of judicial regularity is basic to bench trials:

> In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions. It is equally routine for them to instruct juries that no adverse inference may be drawn from a defendant's failure to testify; surely we must presume that they follow their own instructions when they are acting as fact finders.

*Id.* at 346, 102 S.Ct. at 465.

The rule followed in the circuits that have discussed the issue is that in criminal bench trials, absent an affirmative showing of prejudice, a trial court is presumed to have considered only admissible evidence in making its findings. *United States v. Joseph,* 781 F.2d 549, 552–53 (6th Cir.1986); *United States v. Busch,* 758 F.2d 1394, 1398 (10th Cir.1985); *United States v. Larsen,* 596 F.2d 347, 348 (9th Cir.1979); *United States ex. rel. Placek v. Illinois,* 546 F.2d 1298, 1304, n. 3 (7th Cir.1976) (collecting cases); *United States v. Hughes,* 542 F.2d 246, 248 (5th Cir.1976).

The government has advanced cogent arguments for the admissibility of most of the evidence which defendant claims should have been excluded. We, therefore, have had to review the material. To say that the admitted evidence depicts defendant in a less than favorable light is a gross understatement. Carrying his argument to its ultimate conclusion defendant could claim that it was impossible for him to get either a fair trial or dispassionate appellate review.

In order for our criminal justice system to operate efficiently, it must be assumed that in a bench trial the judge will not be influenced by irrelevant or prejudicial evidence. This assumption can be negated in particular instances by showing that a judge was improperly influenced. There is no such showing in this case.

Our examination of the record shows that there was more than sufficient relevant and nonprejudicial evidence to find the defendant guilty as charged beyond a reasonable doubt.

*Affirmed.*